# EXHIBIT D

Brandy Ruffner
May 24, 2018

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF FLORIDA
 3                      ORLANDO DIVISION
 4   KELLY GONZALEZ,                  Case No.
 5                                    6:17-cv-00543-PGB-DCI
 6           Plaintiff,
 7        vs.
 8   PNC BANK, a national association,
 9           Defendant.
10
11       DEPOSITION OF Brandy Ruffner, called by the
12   Plaintiff, pursuant to the Florida Rules of Civil
13   Procedure, taken by and before Lois Sikoski, a Court
14   Reporter-Notary Public, at Littler Mendelson, P.C., EQT
15   Plaza, 625 Liberty Avenue, 26th Floor, Pittsburgh, PA,
16   on Thursday, May 24, 2018, commencing at 1:00 p.m.
17
18
19
20
21
22
23
24
25
```

Page 10

1 due to a medical issue, we would, you know, start with
2 an interactive process with accommodating the employee,
3 and usually the specialist would interact with that
4 employee during that accommodation process.
5     Q.  And what is the interactive process that occurs
6 when an accommodation request has been made?
7     A.  Typically, the Employee Relations Specialist
8 would contact -- or once it came to their attention,
9 they would reach out to the employee, discuss what
10 accommodations they're requesting.  And the employee
11 was required to fill out a Health Care Questionnaire
12 form for completion from their doctor.  That form was
13 to be handed into the specialist within a certain
14 amount of days.  And it is, then, reviewed to see if we
15 are able to accommodate the request.
16     Q.  Okay.  Is there anything else that you did in
17 that position that you had not yet mentioned?
18     A.  I mean, like I said, I assisted with
19 performance management process, you know, any type of
20 leaves.  I mean, that's the general position of the
21 job.
22     Q.  Okay.  So let's break that down a little more.
23 So "performance management process," tell me how you
24 assisted with that.
25     A.  So, typically, if, you know, an employee -- if

Page 11

1 we've identified that there's areas of concerns that
2 employees are not meeting expectations, at that point,
3 you know, the manager would begin the Corrective Action
4 Process.  And during that process, you know, they would
5 get consultation, either from the ERIC or on their own.
6 Or if, you know, something needed escalated, you know,
7 I would review and assist with, you know, making a
8 collaborative decision for performance management for a
9 particular employee.
10     Q.  But a manager could handle performance issues
11 and discipline for performance issues without involving
12 Employee Relations up to probation; is that right?
13     A.  They are able to issue Corrective Action up to
14 a written warning.  Once it rose to the level of
15 probation, you know, it would be reviewed by the
16 specialist, unless there were circumstances that needed
17 further consultation from Employee Relations, or, you
18 know, there's unique circumstances.
19     Q.  Okay.  And you said also you helped with leave.
20 Can you tell me what you mean by that?
21     A.  So if an employee -- or I mean, it's -- I mean,
22 it's pretty broad.  So if an employee is on leave and
23 they're looking to return back to work, you know, we
24 assist them in finding a job within PNC within our
25 90-day process.

Page 12

1     Also, if the employee is out on leave and they
2 haven't returned, we also assist the managers in that
3 process of getting either more information about their
4 leave or engage in the process in finding out if the
5 employee is returning from leave, and if so, when they
6 are planning on returning back to work, if there's a
7 specified date that the employee is scheduled to return
8 back to work.
9     Q.  You said that you -- when they're returning
10 from leave, that you'd help them find a job within PNC?
11     A.  Correct.  If we've replaced their position.
12     Typically, that 90-day-process is -- you know,
13 if the employee has been replaced within their
14 position, because they haven't returned, for whatever
15 reason, and their leave is no longer protected, then at
16 that point, we would assist them in the 90-day-job
17 process.
18     Q.  Okay.  So the positions would -- may be
19 replaced but not unless the leave had expired?  Is that
20 what you're saying?
21     A.  Correct.
22     Q.  Okay.  Aside from anything you reviewed in
23 preparation for this deposition or anything that you
24 discussed with the PNC attorneys, if you take all of
25 that away, did you have an independent recollection of

Page 13

1 the employee, Kelly Gonzalez, and her time of
2 employment with PNC Bank?
3     A.  I'm not sure what, what you mean.
4     Q.  Sure.  Did you have any memory of Kelly
5 yourself?
6     A.  Yes.
7     Q.  Were you aware that, in October of 2012, while
8 employed at PNC, Kelly Gonzalez had told her husband
9 she was thinking about leaving him, and shortly
10 thereafter, he shot himself, and that her son had found
11 the body?
12     A.  No.
13     Q.  Were you aware of any part of that?
14     A.  I wasn't aware of the full story.
15     Q.  Okay.  Were you aware --
16     A.  I may have --
17     Q.  -- at least part of the story?
18     A.  I may have heard that her husband had passed
19 away, but I really didn't have details of her personal
20 information.
21     Q.  Okay.  Did you know it was suicide?
22     A.  Not that I can recall.
23     Q.  Okay.  Were you aware that after the death of
24 her husband, that she had been diagnosed with
25 depression and anxiety disorders and she took several

Page 14

1  periods of FMLA leave for that?
2     A.   I knew that she took FMLA, but I don't think
3  and I don't know what her personal circumstances were.
4     Q.   Okay. So you never came to know that she had
5  depression anxiety disorders?
6     A.   I mean, again, I don't know anything of her
7  medical information. What I can tell you is that, you
8  know, I did know that she was out on a leave of
9  absence.
10    Q.   Okay. But sometimes -- there are people Kelly
11 shared that with. That's why I'm asking. Was there
12 any way that you had come to know that information?
13    A.   Well, she didn't share anything with me, so,
14 no, I'm not aware of it.
15    Q.   Okay. So you said that you did have some
16 memories of Kelly and her time at PNC. So I want to
17 start with that, of what you have an independent memory
18 of. We'll get into what the paperwork talks about and
19 your involvement of what the paperwork reflects.
20         But I first want to start with, if you would
21 just tell me the things you personally remember, so
22 that I can understand kind of what your memory is
23 versus what you're gleaning from the documents. So go
24 ahead and tell me what is your -- what about Kelly and
25 her time at PNC you have a specific memory of?

Page 15

1     A.   I mean, I remember that, you know, there were
2  some concerns with performance. I remember that I was
3  asked by the HR Business Partner to be involved in
4  those concerns. I understand that there was, you know,
5  leaves process that we were engaged in. I mean, other
6  than that, I mean, unless there's something specific
7  you're looking for, I mean, that's the general
8  knowledge that I have.
9     Q.   Brandy, did you say you were asked by the HR
10 Business Partner to be involved?
11    A.   Pardon me? Yes. But that was -- that was
12 after Kelly had returned. I mean, if you're looking
13 for something specific, I mean, chronologically
14 speaking, you know, we can discuss that. But, I mean,
15 as a generality, and you're asking me what I remember,
16 I mean, those were the situations that I had involving
17 Kelly Gonzalez.
18    Q.   Yeah. Let's go chronologically and tell me
19 what you have a memory of. So, you know, does that
20 make sense to you, that I want to know kind of what you
21 remember versus what you read on paper?
22    A.   I remember that, you know, Kelly was on a leave
23 of absence whenever I was contacted initially about her
24 returning back to work. And we engaged in that process
25 of her returning back to work, which included

Page 16

1  conversations with Kelly, asking her when she was
2  planning on returning to work. And then shortly
3  thereafter, when Kelly did return to work, there was
4  some -- there was a request to become involved between
5  some -- like, between conversations of reiterating
6  expectations. Because Kelly had a written warning that
7  was issued to her prior to her going out on leave. And
8  I was asked to help reinforce or reinstate those
9  expectations, along with her regional manager.
10    Q.   Is that the request you were talking about from
11 the HR Business Partner?
12    A.   Correct.
13    Q.   Is there anything you have a specific memory
14 about with regard to the phone call you had with Kelly
15 while she was still out on leave?
16         MR. RIPPLE: Object to the form of the
17 question. You should answer.
18    A.   I'm sorry. Could you repeat the question?
19 BY MS. HOSLEY:
20    Q.   Sure. So, again, I'm just trying to
21 differentiate between things you might have read and
22 the things you have your own specific memory of. So,
23 can you tell me if you have a memory of any of your
24 telephone conversations with Kelly Gonzalez while she
25 was still out on leave?

Page 17

1     A.   Yes.
2     Q.   Okay. Can you tell me about those.
3     A.   I mean, I remember asking her when she was
4  planning on returning to work. At that time, I don't
5  think she was 100 percent sure when she was returning
6  back to work.
7          There was communication to her that, you know,
8  we needed to get more understanding about her, you
9  know, returning back to work. And I believe she had
10 mentioned, at that time, that she was thinking of
11 coming back part-time for a certain amount of time.
12 And we told -- or I told her that we would review
13 further, but the first step of the process was getting
14 a release from her doctor to return back to work.
15    Q.   You told her that you needed a release from her
16 doctor to return? Is that what you said?
17    A.   Correct. Typically, when an employee is
18 returning back to work, we typically -- if they have
19 restrictions, if she's asking to work part-time, we
20 would need some form of a restriction that, you know,
21 she can work part-time or full-time without any
22 restrictions.
23    Q.   Okay. I think I missed that part. So will you
24 tell me again about her request to work part-time?
25    A.   She had requested to work part-time. It may

Page 18

1  have been either a few weeks or up to a few months.
2  Part of that process, for her working part-time, is to
3  complete a Health Care Questionnaire form or getting a
4  release from her doctor. So since Kelly was requesting
5  to work part-time, it was recommended that she fill out
6  our Health Care Questionnaire form because that is our
7  process.
8        Kelly had refused to engage in that process
9  because she didn't want us -- or PNC, rather, knowing
10 her medical information. So I told her I would review
11 further to see if we were able to do that.
12       Since, you know, she didn't have a formal
13 accommodation, at that point, you know, we told her,
14 you know, you have to either fill out the form, you
15 know, or we can't move forward with the accommodation.
16       And Kelly said that, you know, she wasn't
17 comfortable filling out the information and provided a
18 return to work without restrictions note sometime in
19 March.
20    Q.   I am going to pause right there. I need to
21 take a quick break.
22       (Whereupon, there was a recess in proceedings.)
23 BY MS. HOSLEY:
24    Q.   Okay. I want to go back to -- you said that
25 Kelly had requested to come back part-time. She had

Page 19

1  requested to come back part-time to the Hunters Creek
2  office; is that right?
3     A.   I mean, she didn't specify. We didn't say
4  coming back part-time to Hunters Creek. The
5  communication was that she wanted to come back
6  potentially part-time temporarily.
7     Q.   Did she give you any reason to believe, at that
8  time, that she didn't think that she wanted to come
9  back to her branch that she had been working at?
10    A.   There was no discussion of that.
11    Q.   Okay. Well, she didn't say she wanted to go to
12 a different branch, did she?
13    A.   No. Again, there was no discussion about
14 branches at all, just that she was getting ready to
15 return back to work, but she wanted to go -- or, per
16 her doctor's recommendation, go back part-time.
17    Q.   Okay. Do you have the printouts of your
18 handwritten notes there that I sent to the court
19 reporter.
20       THE REPORTER: I didn't get anything.
21       MS. HOSLEY: We sent stuff time ago, a
22 bunch of documents. Is there a way that you can check
23 with someone. If Nancy forwards them to you, can you
24 print them?
25       MR. RIPPLE: If you forward something to

Page 20

1  me, I can print it off, yes.
2        Off the record.
3        (Whereupon, there was a recess in
4  proceedings.)
5        MR. RIPPLE: Let's go on the record.
6        Why don't you put it back in -- Kim, just
7  so you know what I'm doing. I'm just putting it back
8  in the order that it was put. That way you can kind
9  of -- in case she has those documents, you can walk
10 through and tell her where you find something that is
11 your handwriting, I think is what she's asking.
12    A.   Okay.
13 BY MS. HOSLEY:
14    Q.   After someone else's handwritten notes, you
15 come across all of the handwritten notes in one spot.
16    A.   Okay. I see one handwritten note here for "May
17 performance" that's mine.
18    Q.   It says what?
19    A.   "May performance".
20    Q.   Okay. So let's pull that one out, because I'm
21 going to definitely want to talk to you about that, but
22 not at this moment.
23    A.   What do I do with it?
24    Q.   If you keep going, what's the next one that's
25 your handwritten note?

Page 21

1     A.   It says "Kelly Gonzalez 5/29/15."
2        MR. RIPPLE: Put it right there.
3     A.   "May performance."
4  BY MS. HOSLEY:
5     Q.   Wait. I'm sorry. What?
6     A.   "May performance."
7     Q.   Is that the same one you already told me about?
8     A.   I mean, I'm not sure. I mean, it looks like
9  you have two copies of the same thing.
10    Q.   Okay. Yeah. There's one for Ray and one for
11 you.
12    A.   Okay. Then there's one for 5/29 that I think
13 we just went over. There's another one for 5/29 that's
14 the same copy.
15    Q.   The one that says Kelly Marc San Giovanni
16 5/29/15, is that yours?
17       MR. RIPPLE: This one.
18    A.   Which one?
19       MR. RIPPLE: Kim, I'm sorry. You broke
20 up. Can you repeat the question so she can hear you
21 again.
22 BY MS. HOSLEY:
23    Q.   Sure. I was trying to go through with her, and
24 it looked like she kept looking past one that said
25 "Kelly Marc San Giovanni" at the top and says

Page 26

1  that to what I have here, and see if there are any
2  other ones that I want to double-check for.
3       There's just a couple I want to double-check to
4  see if they're yours or someone else's, that I can't
5  see the Bates stamp number on the bottom of mine.
6       The first one starts, at the top, it says
7  "branch manager Kelly Gonzalez" and it's dated 4/7/15.
8  A.  I'm sorry. Did you say 4/7/15?
9  Q.  Yes. If I don't -- it's not one of the ones
10 you said was yours.
11 A.  Okay.
12 Q.  I just want to confirm, because you can look in
13 the ones -- in the pile that you don't think is yours
14 and just take one or look at these and see if I have to
15 ask you about. So I could just go with certain ones
16 that I have to ask you about are definitely not yours.
17 The first one would be "branch manager Kelly Gonzalez,"
18 it says "04/07/15".
19 A.  Okay.
20 Q.  Did you write anything that's part of those
21 pages that go along with that first page?
22 A.  No, I did not.
23 Q.  Okay. I have eight pages as part of that. Do
24 you have eight?
25 A.  Let me see. Yes. None of these are mine,

Page 27

1  though.
2  Q.  Okay. There's another one that says Brandy
3  Ruffner RE: Kelly Gonzalez. And that is more than
4  likely not yours, but it has your name. So I just want
5  to verify. And it says  "4/01/15".
6  A.  That is not my handwriting.
7  Q.  Okay. Keep that one handy, though, just in
8  case this is someone's notes about a conversation with
9  you. I may want to ask you some questions about that.
10      Okay. And then that one that we were talking
11 about earlier, the one that says "Kelly", then "Marc
12 San Giovanni, 5/29/15." You said that was not one that
13 you had written?
14 A.  No.
15 Q.  And that has six pages in it. Is that what you
16 have?
17 A.  There's seven pages.
18 Q.  I have six, but that's okay. You didn't write
19 it. If I come across something I'm asking you about,
20 and you tell me it's not yours, we'll deal with it
21 then.
22      So -- all right. Let's get back to where we
23 were.
24          MS. HOSLEY: Court reporter, can you tell
25 me what the last question and answer was.

Page 28

1       (Record read back by reporter.)
2  BY MS. HOSLEY:
3  Q.  Thank you.
4       To go back to that conversation you told me
5  about where she asked about going part-time and then
6  you went on to talk about documents, and then that she
7  didn't fill the documents out. Do you have your own
8  independent memory of all of those parts of that
9  conversation?
10 A.  I mean, I remember parts of that conversation,
11 yes.
12 Q.  Okay. What are the parts you remember, without
13 looking at any of the notes, that you can remember
14 sitting on the phone and either hearing or saying?
15 A.  As I explained before, you know, I had called
16 Kelly to see -- because her leave had expired at that
17 point. I did call her to find out when she was
18 returning to work and if she was returning to work.
19      During that conversation, Kelly disclosed that,
20 per her doctor, she wanted -- or it was recommended
21 that she do part-time for -- I don't know if it was a
22 few weeks or a few months, but temporarily, to do
23 part-time.
24      During that process, you know, was told that it
25 could be reviewed; however, Kelly would need to

Page 29

1  complete some documentation per PNC's process. When an
2  employee requests an accommodation, they do have to
3  fill out what's called our Health Care Questionnaire
4  Form. That Health Care Questionnaire Form is filled
5  out by the employee's doctor and then sent to the
6  specialist for further review to see if we're able to
7  accommodate that request.
8       During a conversation that I had with Kelly,
9  she had indicated she did not want PNC knowing her
10 personal medical information; therefore, she did not
11 want to fill out that form. And so she ended up giving
12 me a doctor's note that she was returning to work full
13 time, no restrictions.
14 Q.  And everything you just said, you have an
15 independent memory of; is that right?
16 A.  Correct.
17 Q.  Okay. And did all of that happen in one
18 conversation?
19 A.  It happened, I think, in maybe a couple of
20 conversations.
21 Q.  Okay. I just wanted to make sure I understood.
22      When she first brought up to you about coming
23 back for two to three weeks part-time, do you remember
24 saying to her that because she was a branch manager,
25 they really needed her to be there 40 hours, and it

Page 38

1   A.   -- 4/15, you know, that would be Kelly's
2   branch.  Usually when a branch manager leaves, they
3   partner together and work together before that branch
4   manager would leave.  They do, like, a transition.  But
5   mainly Kelly would be --
6   Q.   What date did -- I'm sorry.
7   A.   But mainly Kelly would be responsible because,
8   you know, that's her branch now.
9   Q.   Okay.  So mainly Kelly but both of them?
10  What -- you said two different things there.  So I just
11  want to make sure I understand your answer.
12  A.   Well, during a transition period, it's not
13  uncommon for managers to partner and work together
14  during that transition.  So, however, she work --
15  however she worked it out with that branch manager, you
16  know, that's up to Kelly and Marc.  That's not up to
17  Employee Relations to figure out.
18  Q.   Did that branch manager leave PNC or take a
19  position elsewhere within PNC?
20  A.   I mean, I'm not sure.  She's -- she was no
21  longer at that branch.  He or she was no longer at that
22  branch.
23  Q.   But it's your position that from the day Kelly
24  arrived at that branch up to April 15, 2015, for that
25  period of time, Kelly was responsible for the

Page 39

1   performance goals of the branch; is that right?
2   A.   I mean, again, that's not an Employee Relations
3   decision.  So, you know, if she's working -- however
4   her and that branch manager, you know, figure it out,
5   it's most likely Kelly's decision, but, again, there's
6   situations where if someone is transitioning, you know,
7   they typically partner together.  That's not uncommon.
8   But that's not -- again, that's not up to Employee
9   Relations to figure that out.  You know, that's
10  something between Marc, Kelly, and that other branch
11  manager to figure out on who's doing what.
12  Q.   It makes sense.  Okay.
13       Can you look at the document that is
14  Bates-stamped PNC01141 and 0011 -- oh, I'm sorry, 01140
15  and 01141.  Oh-oh.  Can you hear us?  We lost you for a
16  minute.  Do you guys see us?  Hear us?
17       MR. RIPPLE:  Yes, we can -- Kim, we've
18  never been able to see you.  We can hear you.
19       MS. HOSLEY:  Yeah.  I guess we refused
20  that option.  Your video is frozen.  Oh, it's kind of
21  frozen, but as long as you can hear us, it looks like
22  it's moving periodically.
23  BY MS. HOSLEY:
24  Q.   All right.  But did you find the documents
25  stamped 01140 and 01141?

Page 40

1   A.   Yes.
2   Q.   Okay.  And this is when Kelly was speaking to
3   you about the written Corrective Action she had been
4   put on; is that correct?
5   A.   Yes.
6   Q.   Okay.  And in it, you noted paragraph 1,
7   Section 3, 100,000 credits monthly she was responsible
8   for.  Do you see that?
9   A.   Yes.
10  Q.   So would you have written that down because
11  that was one of her complaints?
12  A.   Yes.
13  Q.   Okay.  And then if you go down a little bit
14  further, do you see where it says "would like 30 days
15  for May, 15 to 20 days ramp-up."  Do you see that?
16  A.   Yes.
17  Q.   Are those separate thoughts or were those -- do
18  those go together?  Can you explain those two lines for
19  me?
20  A.   So the first one where it says "paragraph 1,
21  Section 3, the 100,000 credits monthly" was Kelly's
22  concern.
23  Q.   I'm sorry.  Yeah.  I'm just down to the "would
24  like 30 days for May."  And the next one it says, "15
25  to 20 days ramp-up."  So can you explain those two

Page 41

1   lines for me?  I'm sorry.
2   A.   So that's what Kelly requested, having 15 to 20
3   days of a ramp-up and potentially 50,000 revenue
4   credits and then get to 100.
5   Q.   Okay.  And what does the "would like 30 days
6   from May" mean?
7   A.   That means she wanted 30 days to get that
8   ramp-up.
9   Q.   Okay.  That's what I was trying to understand
10  because it says "30 days for May," and then it says "15
11  to 20 days."  So, was she kind of -- did she -- she
12  preferred 30 but would take 15 to 20?  Is that what
13  this is reflective of?  Or what does that mean?
14       MR. RIPPLE:  Objection to form.  You can
15  answer.
16  A.   I mean, yeah.  That -- those were -- what was
17  written down is what she was requesting.
18  BY MS. HOSLEY:
19  Q.   Okay.  And then she was requesting that
20  $100,000 -- 100,000 revenue credit requirement to be
21  reduced to 50,000?
22  A.   Correct.
23  Q.   Is that right?  Okay.
24       And do you remember calling her back to tell
25  her that Marc San Giovanni had denied the request for

Page 42

1  the ramp-up period, and that the Corrective Action
2  document would stand as is?
3     A.  Well, she was told the Corrective Action
4  document would stand as is, but we actually
5  accommodated that request.  Marc actually agreed to
6  give her the 50,000 during that time.
7     Q.  Right.  But to begin immediately.  There wasn't
8  a 30 day -- or 15 to 20 days that she would have before
9  those requirements went into place; right?
10    A.  I mean, again, she was accommodated for those
11 50,000.  I mean, the end decision --
12    Q.  I can't hear you.
13    A.  The end decision was that she could have that
14 time to ramp-up.  It was never communicated to her that
15 Marc did not agree.
16        What would have been communicated to her was
17 that I would review further to see if -- you know, I'd
18 have to do my own research to see if we were okay to do
19 that.
20    Q.  Okay.  You broke up a little bit there.
21        But, so, my question is, though, that even if
22 the requirement was reduced to 50,000, it was effective
23 immediately?  She wasn't going to get --
24    A.  Well, yeah.
25    Q.  -- thirty days?

Page 43

1     A.  But she would be --
2     Q.  -- before that requirement --
3         MR. RIPPLE:  Sorry.  You need to let her
4  finish her question.
5     A.  I know.
6         MR. RIPPLE:  I know it's a hard with the
7  phone.
8  BY MS. HOSLEY:
9     Q.  Okay, yeah.  So, again, from my understanding,
10 the 100,000 was reduced to 50,000 for the month of May?
11    A.  Correct.
12    Q.  Right?  So that was on April 28th; is that
13 correct?
14    A.  Right.  Right.
15    Q.  So she wasn't going to get 30 days before that
16 reduced requirement kicked in; correct?
17    A.  Correct.  Because we had already -- at that
18 point, I mean, it was already passed.  I mean, she was
19 given her ramp-up.  I mean, this was just for the
20 revenue credits because that's specifically --
21    Q.  What ramp-up was she given?  Sorry.
22    A.  That's specifically what she was requesting.
23    Q.  Okay.
24    A.  She wanted time --
25    Q.  What ramp-up was she -- sorry.  When you pause,

Page 44

1  I think you're done because our video isn't working
2  really well.  So you're frozen.
3     A.  So she wanted time to ramp-up the branch.  So
4  that had nothing to do with the revenue credit
5  specifically of this 100,000.  She wanted time to
6  ramp-up the branch and get them to where they needed to
7  be.  So those are two separate --
8     Q.  And what --
9     A.  So those would be two separate issues or areas
10 of concern.
11    Q.  So no additional ramp-up period was approved;
12 correct?
13    A.  She was given the 50,000, but there was no,
14 like, prior or pre-ramp up.
15    Q.  There was no prior or there was no prior
16 ramp-up?
17    A.  No.  I mean, she was given the 50,000 revenue
18 credits, as she requested for May.
19    Q.  Right.  Okay.  But in terms of ramp-up
20 period -- and we can get to what that means.  But was
21 there ever a ramp-up period given to her when she
22 started at the Oviedo Branch?
23    A.  She was on Corrective Action when she was at
24 the -- when she returned from leave.  So, I mean, we
25 gave her time before we even reissued that Corrective

Page 45

1  Action.  So I'm not sure what you mean about the
2  ramp-up.  But she was already issued the Corrective
3  Action prior to going out on leave.
4         The Corrective Action stops while she's on
5  leave but it continues when she returns.  We gave her
6  time before we re-introduced that Corrective Action,
7  which was sometime in -- I think it may have been
8  April 25th -- or maybe it was this date of 4/28, but we
9  reiterated those expectations to her.
10    Q.  Right.  You reiterated those expectations to
11 her at the end of April, but before this, had you ever
12 told her that they did not apply?
13    A.  She was never told that -- no, she was never
14 told it didn't apply.
15    Q.  Okay.  Thank you.  Let's see next one.  Can you
16 look at PNC 01142.
17    A.  It's in front of me.
18    Q.  Okay.  So as part of the 50,000 May.  Wanted to
19 make sure.  So is that just her double-checking that
20 her requirement for May was going to be 50,000 per
21 revenue credit?
22    A.  I mean, I don't know what the ending word was,
23 but I mean, yes.
24    Q.  I'm sorry.  What did you say?  You didn't know
25 what the end word was?

Page 46

1  A. Oh, okay. Where it says, "wanted to make
2  sure".
3  Q. Yeah.
4  A. I think this was just between -- I think this
5  was -- this may have been Marc going over her goals
6  with her. Those were concerns that she had brought up,
7  about the 50,000.
8  Q. Okay. And a little further down, it says,
9  "state's minimum for bankers is 100,000 and her
10 100,000." Could you explain that one?
11 A. I mean, again, this is a conversation between
12 her and Marc. So I mean, I'm not -- this is just
13 something that I copied between her and Marc. I don't
14 know exactly what it is.
15 Q. Okay. Do you not have a specific memory about
16 this conversation?
17 A. I have a memory that we had a conversation
18 about it. But, again, this is between her and Marc. I
19 was just taking notes during that conversation.
20 Q. Right.
21 A. And these are the notes from that conversation
22 that her and Marc are speaking to one another.
23 Q. Okay. So based on your observation of that
24 conversation, why was that included in your notes?
25 A. Because she -- I think, at that point, she was

Page 47

1  making comment what the minimum for bankers were and
2  was disputing it.
3  Q. Okay. So despite that it had been reduced for
4  May, she was still concerned about it going forward
5  after May, at the 100,000 level?
6  A. Correct.
7  Q. Okay. And on the -- continuing with the
8  note -- I have it attached. It may not have been part
9  of it. But, anyway, it's PNC01144.
10 A. Okay.
11 Q. And a little more than -- first of all, the
12 date at the top is May 29, 2015; right?
13 A. Yes.
14 Q. Okay. And a little more than halfway down,
15 "does Marc explain debriefs to Kelly and how it should
16 read." Do you see that?
17 A. Yes.
18 Q. There are a lot of other documents, that we're
19 going to go through those, where Kelly is asking for
20 examples and for him to walk her through exactly how he
21 wants the debriefs done because he's not happy with the
22 way she is doing them.
23     Is this the first time that he did finally walk
24 her through one, because it's the first one I can find?
25 So is this first time that he sat down and went through

Page 48

1  a debrief report and showed her how he would like it to
2  read?
3  A. No. I believe he went through those before --
4  before with her. Kelly wasn't understanding how those
5  debrief forms needed to be completed. And I think he
6  may have gone over those with her more than once.
7  Q. Do you think he sat down and went through one
8  of those forms specifically with her before this date?
9  A. Before this date, I mean, I'm not, I'm not
10 100 percent sure. But as far as him reviewing what he
11 wanted on those debriefs, he was very specific with her
12 and I believe provided her examples at her request.
13     Kelly wasn't completing the -- part of the
14 problem was is, not only were they not being completed
15 but they weren't always being turned in either, was the
16 other issue.
17 Q. And can you look in e-mails that are there in
18 front of you for one from Marc San Giovanni to you on
19 May 5th, 2015. The subject is "call on/debrief".
20 A. Yes. I have it in front of me.
21 Q. Okay. And this is a forwarded message from
22 Kelly to Marc. Did you say "yes"?
23 A. I'm reading through it.
24 Q. Oh, okay. If you look at the part that says
25 from Marc.

Page 49

1  A. Again, I'm reading it. Okay.
2  Q. Okay. So the part that says, "forwarded by".
3  Right underneath that. Does it say from Kelly Gonzalez
4  consumerreo@pnc to Marc San Giovanni corebankcnjpnc@
5  pnc?
6  A. Yes.
7  Q. Okay. I just wanted to make sure we were
8  looking at the same thing. That's why I was trying to
9  catch you before you kept reading on the e-mail.
10     All right. So do you see that it says, further
11 down, there's an e-mail -- the original e-mail from
12 Marc to Kelly saying that "the debriefs are still being
13 completed incorrectly". Right?
14 A. Uh-huh.
15     MR. RIPPLE: You need to say "yes".
16 A. Yes.
17 BY MS. HOSLEY:
18 Q. And then it says, "What measure would you
19 recommend I should call to get an example of a debrief
20 log with proper coaching notes, et cetera, so I can
21 assure it is being done to your expectations? Or when
22 we have our first coaching session with Brandy, we can
23 go through one together." Do you see that?
24 A. Yes.
25 Q. So she was trying to get some additional

### Page 70

1  Q. Right.
2  A. -- you know, concerns about Marc. So, yeah, I
3  mean, she was given the opportunity to kind of explain
4  her side and her concerns that were, you know,
5  discussed and reviewed, anything that was, you know,
6  pertinent or concerning to Marc.
7      You know, the purpose --
8  Q. Those were after the meetings. So my question
9  was: So were you having preparation meetings with
10 Kelly before your meeting with Marc, the way you were
11 with Marc?
12 A. No. And, again, you know, that's going over
13 with a manager and -- a manager and Employee Relations.
14 You know, I'm not required to, you know, prep Kelly for
15 her conversation with Marc.
16 Q. Were you required to prep Marc for his
17 conversation with Kelly?
18      MR. RIPPLE: Objection to form. You
19 should answer.
20 A. No. But, you know --
21 BY MS. HOSLEY:
22 Q. Okay.
23 A. Can I finish?
24 Q. You answered my question, but if there's more
25 you want to talk about, then, sure.

### Page 71

1  A. No. It's not required speaking to Marc, but,
2  you know, again, we went over her performance concerns;
3  any concerns he had with her before we had -- before we
4  had the call.
5  Q. Okay. Are you familiar with what Marc wanted
6  in the daily debrief report?
7  A. That is not my area of expertise as a
8  specialist. That is up to Marc and Kelly to kind of
9  work together and decipher what the issues are with
10 those debrief forms.
11     I stepped in to help Kelly, you know, and told
12 Marc, "please provide her specific examples," and
13 interjected, you know, when she requested. But it's
14 not my responsibility, as a specialist, to tell Kelly
15 what she needs to do with those debrief forms. That is
16 not my area of expertise.
17 Q. Okay. Why would it be -- if you looked at the
18 daily debriefs, would you be able to tell what was
19 wrong with them?
20 A. No.
21 Q. Okay. So why was Marc sending those to you?
22 A. Because I was trying to intervene before Kelly
23 had resigned and to figure out what exactly -- because
24 she had asked for help. And I was trying to figure it
25 out, what exactly the miscommunication was between

### Page 72

1  them, that she wasn't getting correct, that he wanted
2  her to do. And him and I were supposed to --
3  Q. Right. Because his --
4  A. Okay. Please let me finish.
5      Him and I were to discuss what exactly those
6  debrief forms were required -- what was required in
7  them, so that I could get a full understanding, and
8  either have, you know, someone support Kelly or review
9  it with Kelly from my knowledge of these reports.
10 BY MS. HOSLEY:
11 Q. So it doesn't look, to me, like, from the
12 e-mails that I have, that he sent you daily debriefs,
13 that there's any detail at all provided to you for what
14 he would like to see differently. So I don't
15 understand how him forwarding along the debriefs and
16 saying, "looks like the coaching didn't work," would
17 help you understand what he wants and then help Kelly?
18 A. I wanted to see the --
19     MR. RIPPLE: Objection to form. You
20 should answer.
21 A. I wanted to see what the debrief forms actually
22 looked like. I had asked for a sample to see how they
23 were supposed to be filled out. Again, Marc was
24 supposed to explain or have somebody mentor. That was
25 the suggestion, to review those debrief forms because

### Page 73

1  they are not an Employee Relations Specialist's area of
2  expertise.
3  BY MS. HOSLEY:
4  Q. Did you receive an example from Marc?
5  A. Yeah. I believe I did, but, you know, again --
6  Q. Do you remember what date that was?
7  A. No.
8  Q. Okay.
9  A. I mean, again, that's up to him and Kelly to
10 decide what should be on that debrief form.
11     The only reason why I got involved was because
12 Kelly had reached out to me that she wasn't sure what
13 was supposed to be on the form. So it was kind of a
14 push to get it resolved, for the two of them, so that
15 she was clear on expectations.
16 Q. So I was asking you these questions because I'm
17 trying to determine if you would be able to tell me
18 what was wrong with the daily debriefs that he
19 forwarded to you? Do you think you would be able to do
20 that?
21 A. No.
22 Q. Okay. Did you have any other conversations
23 with anyone at PNC about Kelly Gonzalez related to FMLA
24 leave, or disability, or her medical -- actually,
25 before we -- actually, you know what, before I ask you

Page 102

1  update information regarding that Employee Relations
2  issue in the ERIC report?
3     A.  Yes.
4     Q.  And what's the purpose of that?
5     A.  To just kind of update our notes, any
6  communication that's, you know, between the Employer or
7  the Specialist, or if the manager, you know, asks
8  questions.  It's really there to serve as a document,
9  and to document any -- anything throughout that
10 research process.
11    Q.  A way for the company to track that issue?
12    A.  Yeah.
13    Q.  Okay.  Are ERIC reports documents that were
14 typically used by Employee Relations -- the Employee
15 Relations Department to record Employee Relations
16 issues?
17    A.  Yes.
18    Q.  In your experience, are ERIC reports regularly
19 prepared by PNC?
20    A.  Yes.
21    Q.  When are the reports typically generated?
22    A.  When the Employer Manager call.
23    Q.  Okay.  All right.  Can you look at the document
24 and see when, when, if at all, you made entries in this
25 report?

Page 103

1     A.  Yes.  So in the "details" section.
2     Q.  On the first page?
3     A.  Yeah.
4     Q.  Okay.  So that's yours.
5     A.  And then at the summary details -- "summary and
6  details", on page 4, would also be written by myself as
7  well.
8     Q.  Okay.  All right.  So did you yourself prepare
9  the entries that are reflected on page 4 of that
10 document?
11    A.  Yes.
12    Q.  What did you end up doing after hearing from
13 Mr. San Giovanni about when Mrs. Gonzalez would be
14 returning from leave?
15    A.  I had contacted Kelly to find out -- well,
16 actually, I called Leaves and Disabilities first, and
17 that's typically what I do, to find out, you know,
18 where they're at with their leave; if it's exhausted,
19 you know, and reach out to the Leaves Department to see
20 if they have, like, an extension request or anything
21 like that.  If not, if they don't have that specific
22 information, then the employee is contacted directly by
23 me, and then I start that interactive process, as far
24 as finding out when they're going to be returning back
25 to work.

Page 104

1     Q.  Okay.  And do you recall what the response was
2  when you contacted the Leaves and Disabilities
3  Department?
4     A.  Typically, it would be her leave would be
5  exhausted.  Once her leave exhausts, then, you know,
6  it's up to Employee Relations to contact that employee
7  to determine whether or not -- or when they're coming
8  back to work.
9     Q.  Okay.  Have you ever heard of a company named
10 Hewitt, H-E-W-I-T-T?
11    A.  Yes.
12    Q.  And what is Hewitt?
13    A.  At the time, in 2015, they were our Leaves and
14 Disabilities vendor.
15    Q.  Like a third-party vendor?
16    A.  Yes.
17    Q.  And that third-party vendor administered leaves
18 taken by employees?
19    A.  Correct.
20        MR. RIPPLE:  Okay.  Nancy, could you
21 please show Ms. Hosley PNC1121.
22        MS. JOHNSON:  Just a second.  Yep.
23    A.  Okay.
24        (Ruffner Deposition Exhibit No. 7 marked for
25 identification.)

Page 105

1  BY MR. RIPPLE:
2     Q.  Okay.  Mrs. Ruffner, I've handed you another
3  document.  It's marked as Ruffner Exhibit 7 for
4  identification purposes.  Do you recognize this
5  document?
6     A.  Yes.
7     Q.  Okay.  And what do you recognize it to be?
8     A.  A conversation that I had with somebody from
9  Hewitt.
10    Q.  Okay.  And what information -- these are
11 handwritten notes?
12    A.  Right.
13    Q.  From your Employee Relations file?
14    A.  Yes.
15    Q.  Regarding Mrs. Gonzalez?
16    A.  Yes.
17    Q.  And what did you learn from your conversation
18 with a representative of Hewitt regarding
19 Mrs. Gonzalez's leave?
20    A.  So her FMLA maximum that she had that -- you
21 know, her 13 -- once her 13 weeks exhausts was approved
22 up until 3/24/15.
23    Q.  Okay.
24    A.  But her short-term disability, she still had
25 approval until April 1st, 2015; but the FMLA job

Page 110

1  having a conversation with Mr. San Giovanni on
2  March 25th, 2015 at 8:30 in the morning, as of this
3  time, he doesn't know if Mrs. Gonzalez is returning to
4  work; is that correct?
5      A.   Correct.
6      Q.   Because her leave has already expired, and he's
7  now interested in knowing whether somebody is going to
8  be coming to that branch to be the branch manager;
9  correct?
10     A.   Correct.
11         MS. HOSLEY:  Objection.
12 BY MR. RIPPLE:
13     Q.   And at that time you did not know yourself
14 whether Mrs. Gonzalez was going to be returning to PNC;
15 correct?
16     A.   Correct.
17     Q.   And so, if you look at these notes, what do
18 they tell you was transpiring in that telephone
19 conversation between you and Mr. San Giovanni on
20 March 25th, 2015 at 8:30 in the morning?
21     A.   This is, like, you know, informing me that, you
22 know, her branch, at that time, in 2015, around March,
23 is when some of the branches in Florida were going
24 universal.  So at that time, you know, it was crucial,
25 you know, for the success of the branch, that the, you

Page 111

1  know, branch be fully staffed with a branch manager.
2          We had discussed at that point, you know, Kelly
3  had not had any training prior to March going
4  universal; therefore, she didn't have the experience as
5  a branch manager to operate a universal branch.  So we
6  were looking for options; you know, her returning from
7  leave, you know, concerns with performance; looking for
8  ways to, you know, maybe accommodate her to a different
9  branch that was still traditional.
10         South Orlando was an option because they were
11 not going universal until June.  It would be easily
12 accommodated for her, as far as travel, you know,
13 similar in branch staffing, I believe.
14         It was also talked about, potentially, going to
15 Grove Lynn because that was a traditional branch.  It
16 would help her get acclimated since she wasn't trained
17 for universal.  So those were two options that we first
18 discussed as a potential possibility.
19     Q.   And would it be fair to say that these
20 conversations about, you know, potential branches that
21 Mrs. Gonzalez may be able to come back to, were you all
22 trying to think in advance about where she could go, if
23 she was coming back?
24     A.   Right.
25     Q.   Okay.  Now, as part of this process, this issue

Page 112

1  of whether Mrs. Gonzalez was going to be coming back to
2  work at PNC, did you end up contacting Mrs. Gonzalez to
3  discuss this issue with her?
4      A.   Yes.  Prior to her coming back from leave, I
5  did have a conversation with her.  I wanted to ask when
6  she was, you know, returning back to work.
7          At that time she had mentioned that, per the
8  instruction of her doctor, it was suggested that she
9  work part-time.  We don't have part-time branch manager
10 positions.  So the communication to her was it could be
11 reviewed.
12         And at that point, I think -- I don't -- it
13 wasn't presented to her talking about a different
14 branch at that point.  It was mainly the focus of
15 getting her back from leave and getting communication
16 from her doctor, if she was returning from leave with
17 any restrictions, which, at that point, she had said
18 that the doctor had communicated to her that part-time
19 for a temporary basis would be beneficial to her.
20         MR. RIPPLE:  Okay.  Nancy, could you
21 please provide Ms. Hosley with a copy of PNC1132.
22         MS. JOHNSON:  There you go.
23         (Ruffner Deposition Exhibit No. 10 marked
24 for identification.)
25 BY MR. RIPPLE:

Page 113

1      Q.   Mrs. Ruffner, I've handed you a document which
2  has been marked as Ruffner Exhibit 10 for
3  identification purposes.  Do you recognize this
4  document?
5      A.   Yes.
6      Q.   And what do you recognize it to be?
7      A.   It looks like some notes as far as my
8  conversation with Kelly.
9      Q.   Okay.  And this is a conversation with
10 Mrs. Gonzalez about whether she was returning to
11 leave --
12     A.   Yes.
13     Q.   -- or returning from leave, I should say?
14 Excuse me.
15     A.   Correct.
16     Q.   Okay.  This is a telephone conversation that
17 took place on March 25th, 2015 at 3:15?
18     A.   Yes.
19     Q.   And these are handwritten notes that you made
20 regarding that call?
21     A.   Yes.
22     Q.   Now, when you would take these handwritten
23 notes, would you make the notes, literally, during the
24 conversation, while the two of you were talking, or
25 would you summarize your call afterwards?

### Page 114

1  A.  Typically, I'd write it as I'm talking.
2  Q.  And is this handwritten note similar to the
3  other handwritten note that you talked about a moment
4  ago, that this is something that you would generate in
5  the regular course of business while working for PNC as
6  an Employee Relations Specialist?
7  A.  Yes.
8  Q.  Okay.  And to your knowledge, do other Employee
9  Relations Specialists, who work at PNC in a similar
10 role as you, generate hand notes of the same type?
11 A.  Yes.
12 Q.  And Mrs. Lockard, your supervisor, would she be
13 aware that you generate hand notes of this type when
14 you're dealing with Employee Relation issues with PNC?
15 A.  Yes.
16         MS. HOSLEY:  Object to form.  Calls for
17 speculation.
18 BY MR. RIPPLE:
19 Q.  I direct your attention to the exhibit.  What
20 ended up happening during that telephone conversation
21 with Mrs. Ruffner {verbatim}?  What do these notes
22 reflect?
23 A.  This is a conversation I had with Kelly
24 regarding her doctor's appointment.  That conversation,
25 you know, again, was the part-time basis for the first

### Page 115

1  few weeks that she returns, and that she would be
2  released on a part-time basis on April 1st, and then go
3  back to work full-time two to three weeks.  So I think
4  the next doctor's appointment would be 3/31/15 for an
5  update --
6  Q.  Okay.
7  A.  -- from her doctor.
8  Q.  Okay.  And at this point in time that you've
9  spoken with Mrs. Gonzalez, she's still in a situation
10 where her leave has expired; she's on an unprotected
11 leave at this point; correct?
12 A.  Correct.
13 Q.  But you're still continuing to have a dialogue
14 with her about how she can come back to work; correct?
15 A.  Correct.
16 Q.  Did you tell her that you would look into the
17 issue of whether she could come back part-time?
18 A.  Yes.
19 Q.  And is that something you did in fact do?
20 A.  Yes.
21 Q.  Okay.  How did you end up addressing the
22 part-time issue with Mrs. Gonzalez?
23         MS. HOSLEY:  Objection.  Asked and
24 answered.
25 BY MR. RIPPLE:

### Page 116

1  Q.  Go ahead.
2  A.  When her -- the communication to Mrs. Gonzalez,
3  at the time, was, you know, we would review further.
4  It was reviewed.  And at that time it was recommended
5  to Kelly that she would need to fill out PNC's Health
6  Care Questionnaire Form in order for us to do that
7  accommodation process for her, as required for any
8  employee at PNC that's requesting an accommodation or
9  restrictions.
10 Q.  And did she, in fact -- strike that.  Let me
11 rephrase.
12     Did you, in fact, provide Mrs. Gonzalez with
13 that health care questionnaire?
14 A.  Yes.  It would have been sent to her e-mail.
15         MS. HOSLEY:  Objection.  Asked and
16 answered.  Objection.  Asked and answered.
17 BY MR. RIPPLE:
18 Q.  Did she agree to provide it to you?
19 A.  No.  She refused to provide.
20         MS. HOSLEY:  Objection.  Asked and
21 answered.
22 BY MR. RIPPLE:
23 Q.  Did she tell why she was refusing to provide
24 you with the health care questionnaire.
25 A.  She didn't want PNC --

### Page 117

1         MS. HOSLEY:  Objection.  Asked and
2  answered.
3  A.  -- having any medical knowledge of her -- I'm
4  sorry.  She didn't want PNC having any record or
5  knowledge of her medical condition.
6         MR. RIPPLE:  Nancy, can you give me Ms.
7  Hosley PNC1139.
8         MS. JOHNSON:  39?
9         MR. RIPPLE:  1139, yes.
10        (Ruffner Deposition Exhibit No. 11 marked
11 for identification.)
12 BY MR. RIPPLE:
13 Q.  Do you recognize the document I've placed in
14 front of you?  It's marked as Ruffner Exhibit 11 for
15 identification purposes.
16 A.  Yes.
17 Q.  What do you recognize it to be?
18 A.  It is a doctor's note that Kelly had provided
19 that she may return to work full-time with no
20 restrictions on April 3rd.
21 Q.  And during your discussions with Mrs. Gonzalez
22 about her returning to work part-time or full-time, did
23 she ever tell you that there was any aspect of her job
24 that she would not be able to perform upon returning to
25 work?

Page 118

1    A.   No.
2    Q.   When she returned from leave, she returned to
3    the Oviedo Branch instead Hunters Creek Branch; is that
4    correct?
5    A.   Correct.
6    Q.   Why is that?
7    A.   After -- as I mentioned we --
8         MS. HOSLEY:  Objection.  Asked and
9    answered.
10   BY MR. RIPPLE:
11   Q.   Go ahead.
12   A.   I'm sorry.  What was the question?  I got
13   distracted there.
14        MR. RIPPLE:  I'll let the reporter read it
15   back.
16        (Record read back by reporter.)
17   A.   Yes.  Yes.  Then, as I mentioned before, there
18   was discussion about her branch going universal.  And,
19   you know, I told Marc I would review further as, you
20   know, requested.  And I did review it.  And alignment
21   would be if, you know, it was Kelly's decision.  That's
22   what we agreed to.  And it was presented to Kelly as
23   her decision.  So if she wanted to go back to Hunters
24   Creek, she could certainly go back there, but this was
25   presented to her as another option.

Page 119

1    Q.   During your conversations with Mrs. Gonzalez
2    about returning from leave, did she ever express a
3    concern to you about going to the Oviedo Branch?
4    A.   No.
5    Q.   If Mrs. Gonzalez had told you that she did not
6    want to work to the Oviedo Branch, would you still have
7    permitted it to happen?
8    A.   No.
9    Q.   In your role as an ER specialist --
10        MS. HOSLEY:  Objection.  We object to
11   form.
12   BY MS. HOSLEY:
13   Q.   In your role as an ER Specialist, if you had
14   known -- or strike that.
15        If you had thought that Mrs. Gonzalez's
16   transfer to the Oviedo Branch was a demotion for
17   Mrs. Gonzalez, would you have allowed her to transfer
18   to that branch?
19   A.   No.  But, you know, she's --
20        MS. HOSLEY:  Objection.
21   A.   -- going from one branch manager position to
22   another branch manager position.  So it's not
23   considered a demotion.
24   BY MR. RIPPLE:
25   Q.   If you had thought that Mrs. Gonzalez's move to

Page 120

1    the Oviedo Branch would not be something that is
2    beneficial for her, would you have allowed it to
3    happen?
4    A.   No.
5         MS. HOSLEY:  Objection.
6    BY MR. RIPPLE:
7    Q.   If you thought that Mr. San Giovanni was
8    attempting to transfer her to the Oviedo Branch to set
9    her up for failure, would you have allowed it to
10   happen?
11   A.   No.
12        MS. HOSLEY:  Objection.  Calls for
13   speculation.
14        MR. RIPPLE:  Okay.  I have no further
15   questions.
16               EXAMINATION
17   BY MS. HOSLEY:
18   Q.   I wanted to point out -- oops.  I have another
19   question.
20        You testified earlier that when Marc San
21   Giovanni sent you the e-mail, that -- I'm not sure what
22   it's marked as what exhibit, but it's PNC01135.  You
23   were asked at that time if her leave had expired, and
24   you said "yes"; but on the other document, marked
25   PNC01132 -- sorry about that.  Actually, 01121, it says

Page 121

1    her FMLA leave ends on 3/24/2015.  If her FMLA leave
2    ends on 3/24/15, it hasn't expired.  It would expire at
3    11:59 p.m. on 3/24/15; isn't that right?
4    A.   No.  It expires on 3/24.  So she still was not
5    back to work.
6    Q.   What time of day, on 3/24, are you claiming
7    that it would have expired?
8    A.   I mean, 3/25 -- so 3/25, technically, it
9    expired.  And that's when these conversations had taken
10   place.
11   Q.   3/25 technically it expired; right?
12   A.   Well, it expired on 3/24.  So at the end of
13   business on 3/24, her leave would expire.
14   Q.   Right.  So your testimony wasn't accurate
15   earlier when you said -- when you got that -- when he
16   sent that e-mail, her leave had expired, when you wrote
17   those notes her leave had expired, that's not true;
18   right?
19   A.   Her leave had expired on 3/24.
20   Q.   Not until the end of the day, though?
21   A.   End of business on 3/24, her leave would
22   expire.
23   Q.   The last question.  So when you got that e-mail
24   and when you wrote these notes, her leave had not yet
25   expired; isn't that right?

126

COMMONWEALTH OF PENNSYLVANIA )

COUNTY OF ALLEGHENY            )

        I, Lois Sikoski, a Court Reporter and a notary public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, BRANDY RUFFNER, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

        I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness.

        I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 4th day of June, 2018.

_____
Lois Sikoski
Notary Public

My Commission Expires August 2, 2020.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Lois Sikoski, Notary Public
Ambridge Boro, Beaver County
My Commission Expires Aug. 2, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Discussion w/ Hewitt          3/13/15
Kelly Gonzalez

FMLA Max 13 weeks approved up to 3/24/15.

Short term disability maximum approval 4/1/15

FMLA ends 3/24/15

DEPOSITION EXHIBIT
Ruther 7

CONFIDENTIAL

PNC 01121

PAGE 2/2 * RCVD AT 4/2/2015 9:57:04 AM [Eastern Daylight...



DEPOSITION EXHIBIT
Kottner 8

DEA#BI3989677
**Florida Hospital Center for Behavioral Health**
Segundo A. Imbert, M.D.
Linda Bloecker, PMHCNS-BC, Psychiatric ARNP

1885 Lee Road, Suite 100;    400 Celebration Place, Suite A120,    601 East Rollins Street
Winter Park, FL 32789      Celebration, FL 34747      Orlando, FL 32803
407-898-8097    Fax: 407-898-8328

Name: Kelly Gonzalez

Address: _____ Date: April 2, 2015

℞ (Please Print)

Patient may return to work full-time no restrictions on April 3, 2015

☐ Label
Parts ☐   Names   Prn   NR

Brand Medically Necessary _____

In order for a brand name product to be dispensed, prescriber must write "Medically Necessary" below signature.

CONFIDENTIAL

PNC 01139