KELLY GONZALEZ,

       Plaintiff,

v.                              Case No:  6:17-cv-543-Orl-40DCI

PNC BANK, N.A.,

       Defendant.
_____/

## ORDER

This matter is before the Court without oral argument on Defendant PNC Bank, N.A.'s Motion for Summary Judgment (Doc. 21), Plaintiff's Response (Doc. 23), and Defendant's Reply (Doc. 25). With briefing complete, the matter is ripe. Upon consideration of the record as cited by the parties in their respective briefs, the Court finds that Defendant's Motion for Summary Judgment is due to be granted.

## I.    BACKGROUND

Plaintiff, Kelly Gonzalez, began working for Defendant, PNC Bank, N.A. ("**PNC**") on March 3, 2012, as a Branch Manager at a PNC retail branch in Hunter's Creek, Florida ("**Hunter's Creek Branch**"). (Doc. 21-4, 22:17–23:10).

### A.    Plaintiff Reports to Santoro

Plaintiff reported to Regional Manager Marco Santoro ("**Santoro**"). (*Id.* at 23:8–10). On October 24, 2012, Plaintiff informed Santoro that her husband committed suicide that day. (Doc. 24, ¶ 2; Doc. 24-1, 35:24–36:11). Initially, Plaintiff took five days of approved bereavement leave. (Doc. 24-1, 37:21–38:1). After a brief return to work, Plaintiff took approved leave under PNC's Family Medical Leave Policy ("**FML Policy**")

beginning November 21, 2012.[1] (Doc. 24, ¶ 4). Plaintiff returned to work on February 18, 2013, having exhausted her leave. (*Id.*; Doc. 24-1, 41:8–12). After Plaintiff returned, Santoro complained to Plaintiff that the Hunter's Creek Branch was underperforming. (Doc. 23-5, 57:9–58:21).

## B.    Plaintiff Reports to Dyrlund

In March 2013, Plaintiff began reporting to Regional Manager Jeffrey Dyrlund. (Doc. 24-1, 71:9–14). In Plaintiff's 2013 annual review, Dyrlund rated Plaintiff's performance "Meets Some Expectations." (Doc. 21-4, 78:25–79:18, pp. 57–58).[2] The 2013 review shows that Plaintiff exceeded several of her production goals, including business lending volume, home equity loan production, and consumer savings production. (*Id.* at p. 57). The review also identified several areas where Plaintiff was expected to improve, including her daily debrief skills and overall leadership skills.[3] (*Id.* at 88:20–89:25, pp. 57–58). Plaintiff submits that the commentary portion of Plaintiff's 2013 review—written by Dyrlund—reveals that Plaintiff's performance was rated "for the first half of the year when she was on leave lower than her performance in the second half of the year." (Doc. 23, p. 6).[4]

---

[1]    PNC's FML Policy allowed for thirteen weeks of unpaid leave to eligible employees. (Doc. 24, ¶ 3). Requests for medical leave time—including Plaintiff's—were managed by a third-party administrator. (Doc. 21-5, 104:9–19).

[2]    Plaintiff characterized a "meets some expectations" rating as "a typical rating." (*Id.* at 80:6–7).

[3]    PNC's "Branch Success Guide" requires managers to conduct daily debriefs with employees, in addition to regular observations and coaching. (Doc. 24, ¶ 1).

[4]    In support, Plaintiff highlights an exchange from Dyrlund's deposition, in which Dyrlund agreed that "by the end of 2013, [Dyrlund felt] that [Plaintiff] was turning things around[.]" (Doc. 23-8, 26:10–12). Plaintiff also cites the 2013 review itself, which

On June 10, 2014, Plaintiff again took leave under PNC's FML Policy, returning to work July 15, 2014. (Doc. 21-4, 93:19–21). Plaintiff told Dyrlund the circumstances surrounding her medical leave, and in response he told her "I hope that you're getting past that, you know, and that we're going to be able to really get this branch up and running." (*Id.* at 100:10–21; Doc. 23-8, 14:24–15:21). Plaintiff kept in contact with Dyrlund while out on leave; at one point, Dyrlund sent Plaintiff a text message stating "I was expecting you back at work today." (Doc. 21-4, 98:12–99:2). Dyrlund also conveyed to Plaintiff that other branches were "having to help out the [Hunter's Creek] branch while [Plaintiff was] out." (*Id.* at 99:13–24). Upon her return, Dyrlund directed Plaintiff to contact the PNC managers that assisted the Hunter's Creek Branch while she was out. (*Id.* at 99:22–100:4).

In her 2014 Mid-Year Performance Evaluation, Dyrlund again rated Plaintiff "Meets Some Expectations." (*Id.* at 114:16–117:7, p. 65). Plaintiff maintains that the 2014 Mid-Year Performance Evaluation erroneously states that she met three performance goals when she actually met four. (Doc. 23-5, 119:24–121:5, Doc. 21-4, p. 65). This evaluation, like the 2013 evaluation, identified "performance issues" and areas in need of improvement—including areas highlighted in Plaintiff's 2013 review. (Doc. 21-4, p. 65).

In August 2014, Tony Rafael, one of the Hunter's Creek Branch's "highest performing bankers" (Doc. 23, p. 7) was transferred to a different PNC Branch. (Doc. 23-8, 35:16–23). Mr. Rafael's transfer defied a PNC guideline which provided that employees should only be transferred after they have been in their position for twelve months and

---

neither supports nor refutes Plaintiff's proposition, though it notes "a few difficult conversations" between Dyrlund and Plaintiff. (*Id.* at pp. 17–18).

left the Hunter's Creek Branch understaffed. (Doc. 21-4, 189:2–17; Doc. 23-8, 36:3–23). Mr. Rafael's position was filled in January 2015. (Doc. 21-12, ¶ 16).[5]

### C. Plaintiff Reports to San Giovanni

In September 2014, Plaintiff began reporting to Regional Manager Marc San Giovanni. (Doc. 21-4, 113:9–17). On October 1, 2014, they met for the first time. (*Id.* at 148:13–23; Doc. 21-8, ¶ 7). In this meeting, San Giovanni told Plaintiff they would not have a "very good working relationship" unless Plaintiff's production[6] improved. (Doc. 21-4, 135:14–138:13, 142:1–15). Plaintiff was uncomfortable with how the meeting went, so she complained to PNC's Employee Relations Information Center ("**ERIC**") that she and San Giovanni were never formally introduced, and that San Giovanni was condescending and rude. (*Id.* at 137:19–139:24; Doc. 21-8, ¶ 7, pp. 19–20). On November 17, 2014, San Giovanni again met with Plaintiff, this time to relay two complaints about Plaintiff that he received from junior employees at the Hunter's Creek Branch. (Doc. 21-6 ¶ 5, p. 6).[7] Plaintiff would complain about this interaction to an ERIC specialist, noting that the

---

[5]  Defendant submits the Declaration of Beatrice Ginebra, a recruiter employed by PNC, to explain how PNC filled Mr. Rafael's position. (Doc. 21-12). The position was posted on PNC's website on August 12, 2014. (*Id.* ¶ 4). The first formal interview of a candidate took place on September 3, 2014. (*Id.* ¶ 10). Six candidates were interviewed, and on December 29, 2014, Danielle Renaud was offered the job. (*Id.* ¶¶ 9–16). She started work in the Hunter's Creek Branch on January 24, 2015. (*Id.* ¶ 16).

[6]  In her deposition, Plaintiff stressed that San Giovanni did not bring up "branch performance," but conceded that they discussed the need for Plaintiff to "conduct daily debriefs and other activities within the branch." (Doc. 21-4, 142:1–15). San Giovanni did not mention Plaintiff's medical condition or use of leave. (*Id.* at 144:9–15).

[7]  The first employee complained that Plaintiff was inattentive toward clients and the Hunter's Creek Branch staff. (*Id.*). The second employee complained that Plaintiff was dismissive in failing to accommodate an appointment the employee had requested. (*Id.*).

4

alleged complaints were unfounded, and that San Giovanni was dismissive when Plaintiff sought to explain herself. (*Id.*).[8] Soon after, Plaintiff told San Giovanni she would be out on leave the rest of the work week. (Doc. 21-4, 155:9–159:15). She then took approved medical leave pursuant to PNC's FML Policy for November 18–21, 2014. (*Id.* at 147:17–148:12, 161:18–163:9).

On December 3, 2014, Plaintiff met with San Giovanni. (*Id.* at 166:6–12). During the meeting, San Giovanni advised Plaintiff that her "absences were going to [pose] a problem," and also that the Hunter's Creek Branch fell short of its November goals and that the branch needed to improve its performance. (*Id.* at 162:2–11, 166:19–167:8).[9] That same day, Plaintiff requested intermittent leave under PNC's FML Policy to leave the office two to four hours per week to accommodate medical appointments; this request was granted. (Doc. 21-4, 163:16–165:9, 168:1–21). On December 4, 2014, San Giovanni sent Plaintiff a follow-up email conveying a verbal warning for the Hunter's Creek Branch missing November performance goals. (*Id.* at 165:23–166:16).

On December 10, 2014, San Giovanni and Human Resources Business Partner, Julie Cart, presented Plaintiff with a Personal Improvement Plan ("**PIP**") for December 2014 through February 2015. (*Id.* at 169:15–170:13, pp. 74–75; Doc. 21-8, ¶ 12, p. 30).

---

[8] On November 18, 2014, Plaintiff repeated the same complaints she had previously lodged about San Giovanni to an ERIC specialist. (Doc. 21-8, ¶ 8, p. 25).

[9] San Giovanni submitted a sworn declaration affirming that the Hunter's Creek Branch missed production goals in March, April, May, July, August, and November. (Doc. 21-3, ¶ 9). In support, San Giovanni attached a PNC "Red Yellow Green Report" which indicates that the Hunter's Creek Branch was an "outlier"—meaning that it missed production goals—in March, April, May, July, August, and November. (*Id.* at p. 17). Plaintiff baldly disagrees and testified in her deposition that November "was the only month throughout the year of 2014 that the branch had not hit the minimum goals . . . ." (Doc. 23-5, 185:23–186:5).

During the meeting—and as memorialized in the PIP—Plaintiff received instructions to assist in meeting her branch's goals. (Doc. 21-4, 173:7–175:8, pp. 74–75). Also, in December 2014, San Giovanni notified Plaintiff and other Orlando-area PNC employees of changes to PNC's incentive program, which set goals to measure an employee's "revenue credit performance." (Doc. 21-3, ¶ 11).

On January 22, 2015, San Giovanni gave Plaintiff a "Written Warning" based on the Hunter's Creek Branch performance in the fourth quarter of 2014. (Doc. 21-4, at 196:1–12, pp. 76–78). The warning documented persistent problems with Plaintiff's performance, advised Plaintiff of her performance expectations, and instructed Plaintiff of specific activities she should undertake to improve performance. (*Id.* at pp. 76–78). The Written Warning set a goal for Plaintiff to meet "100,000 revenue credits per month" and each banker in her branch meet 100,000 monthly revenue credits. (*Id.* at p. 76; Doc. 23-9, 101:10–102:7).[10] Plaintiff was warned that failure to live up to expectations may result in her termination. (Doc. 21-4, p. 77).

The Hunter's Creek Branch was one of the only PNC branches that received a review based on quarterly performance. (Doc. 23-9, 109:7–110:3).[11] Plaintiff testified in her deposition that San Giovanni "made up his own quarterly standard" to justify giving

---

[10]  San Giovanni's boss, Melissa Mickle, testified that 100,000 credits per month was an "aggressive goal." (Doc. 23-4, 41:15–24).

[11]  Although in his deposition, San Giovanni denied conducting quarterly performance reviews at other PNC branches, Defendant attached to its summary judgment motion a written warning issued by San Giovanni to a different PNC branch manager—months before Plaintiff's Written Warning—that referenced the employee's quarterly performance. (Doc. 21-3, pp. 14–15).

her a written warning.[12] (Doc. 23-5, 198:13–199:7). The review period included November 2014, a month in which Plaintiff was out of work for a week on approved medical leave. (Doc. 21-4, 147:17–148:12, 161:18–163:9).

On January 23, 2015, Plaintiff called PNC's Ethics hotline to complain that San Giovanni was retaliating against Plaintiff for the complaints she aired in October 2014. (*Id.* at 231:13–17; Doc. 21-9, ¶ 5, pp. 12–13; Doc. 21-10, 31:10–32:20, 36:25–37:18). Between January and April 2015, PNC's internal Employee Relations Investigator, Renee Cuffee, investigated the retaliation complaint. (Doc. 21-9, ¶¶ 5–6). Upon completion of the investigation, Cuffee concluded that the retaliation complaint was unfounded, and that the root issues were "interpersonal conflict and performance." (*Id.* at pp. 10–13).

On January 29, 2015, Plaintiff applied for leave under PNC's FML Policy. (Doc. 21-4, 257:10–22). Plaintiff's leave request was approved through March 24, 2015, when her available leave under PNC's FML Policy would be exhausted. (Doc. 21-5, 105:2–22, p. 16). Plaintiff did not immediately return after her leave expired. (*Id.* at 28:12–18). When PNC Employee Relations Specialist Brandy Ruffner called Plaintiff to discuss why she had not returned, Plaintiff stated she was considering returning on a part-time basis. (*Id.* at 28:19–23, 114:19–115:20). In response, Ruffner told Plaintiff that she needed a doctor's note and to complete a healthcare questionnaire establishing a basis for the part-time request. (*Id.* at 28:12–29:13). Plaintiff eventually submitted a doctor's note clearing her to "return to work full time [with] no restrictions on April 3, 2015." (Doc. 21-4, 261:4–10; Doc. 21-5, p. 17).

---

[12] *But see* note 11.

## D.    Plaintiff Transfers to the Oviedo Branch

After Plaintiff relayed to Ruffner her concern about returning to work, Ruffner presented Plaintiff the option of "start[ing] over," that is, relocating to PNC's retail branch in Oviedo, Florida (the "**Oviedo Branch**"). (Doc. 21-4, 262:6–263:2). Plaintiff decided to pursue this option and began working at the Oviedo Branch on April 3, 2015. (*Id.* at 271:11–23; Doc. 21-5, 118:2–119:4).[13] Mr. San Giovanni remained Plaintiff's regional manager after Plaintiff transferred to the Oviedo Branch. (Doc. 21-4, 271:24–272:3).

In an April 24, 2015, conference call, San Giovanni, Ruffner, and Plaintiff went over the performance expectations set forth in the Written Warning and Plaintiff was advised that the warning still applied. (Doc. 21-5, 41:24–44:18). Plaintiff requested (1) that her revenue credit goal be reduced from 100,000 to 50,000 for May, and (2) additional time to develop the Oviedo branch before being held accountable for the performance expectations. (Doc. 21-4, 283:19–285:7; Doc. 21-5, 40:2–45:23). Plaintiff's first request was granted, and San Giovanni agreed to reduce Plaintiff's May revenue credit goal to 50,000. (Doc. 21-5, 40:2–45:23). However, Plaintiff's other request—for additional time

---

[13] Plaintiff submits an affidavit attesting that her "transfer to the Oviedo Branch was not presented to [her] as an option." (Doc. 23-3, ¶ 11). This submission directly contradicts Plaintiff's deposition testimony that she voluntarily transferred. (Doc. 21-4, 262:6– 263:2, 271:11–23). The Court disregards the affidavit as a "sham affidavit." "When a party has given clear answers to unambiguous questions which negate the existence of any issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984). District courts may "disregard an affidavit that 'contradicts, without explanation, previously given clear testimony.'" *Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986). Here, Plaintiff's deposition was clear and unambiguous on the point that the transfer to Oviedo was voluntary. Her affidavit attesting otherwise is thus disregarded. *See Lane*, 782 F.2d at 1532.

to "ramp-up" branch performance before being held to her performance goals—was denied. (*Id.*).

Also, on April 24, 2015, Plaintiff again complained to the PNC Ethics Hotline, in part rehashing earlier complaints that San Giovanni had treated her unprofessionally since they first met. (Doc. 21-9, ¶¶ 7–8, pp. 21–22). In her complaint, she noted that the Oviedo Branch had "much lower traffic" than the Hunter's Creek Branch and meeting performance goals would require significant "drumming up of business." (*Id.* at p. 21). Believing that her performance goals were unachievable, she asserted that her relocation to the Oviedo Branch was evidence of further retaliation by San Giovanni and his bid to "get rid of [Plaintiff]." (*Id.*). On May 12, Plaintiff discussed the complaint with Cuffee, the internal investigator assigned to the case. (*Id.* at p. 19). Plaintiff noted that San Giovanni agreed to give her additional time to meet her revenue credit goal but expressed concern that the Oviedo Branch's expectations remained unrealistic. (*Id.*).

On June 1, 2015, Cuffee met with San Giovanni along with several other human resources employees to discuss Plaintiff's April 24, 2015, complaint. (Doc. 21-3, ¶ 14; Doc. 21-9, pp. 20–21). Later that day, San Giovanni emailed Plaintiff information about logging in to PNC's performance management database. (Doc. 21-3, ¶¶ 14–15, p. 28; Doc. 21-9, pp. 20–21). The afternoon of June 1, 2015, Plaintiff gave her two weeks' notice. (Doc. 21-4, 306:6–21). Though her last working day was June 2, 2015, she was paid for her final two weeks. (Doc. 21-7, 142:2–143:5).

Plaintiff initiated this action on March 28, 2017, by filing the Complaint. (Doc. 1). The Complaint asserts five Counts: (I) a Family Medical Leave Act ("**FMLA**") interference claim; (II) an FMLA retaliation claim; (III) an Americans with Disabilities Act ("**ADA**")

discrimination claim; (IV) an ADA retaliation claim; and (V) a constructive discharge claim. (Doc. 1). Defendant moves for summary judgment on all counts. (Doc. 21).

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[14]

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating the absence of a genuine factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the movant shows that there is no evidence to support the non-moving

---

[14]  "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

party's case, the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine factual disputes which preclude judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). Summary judgment is proper when a plaintiff fails to adequately prove up an essential element of their claim. *Celotex*, 477 U.S. at 322–23.

## III.   DISCUSSION

### A.   Count V: Constructive Discharge

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)). "[A]ctionable harassment" against a plaintiff is insufficient alone to sustain a constructive discharge claim. *Walton v. Johnson & Johnson Servs.*, 347 F.3d 1272, 1282 (11th Cir. 2003). Indeed, "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Id.* (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)).[15] To survive summary judgment, "the plaintiff must produce substantial evidence that conditions were intolerable." *Akins v. Fulton Cty.*, 420 F.3d 1293, 1302 (11th Cir. 2005).

---

[15] To make out a hostile work environment claim, a plaintiff "must allege, and ultimately prove, discriminatory behavior 'sufficiently severe to alter the conditions of his employment.'" *Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129, 1141 (M.D. Fla. 2016) (alteration accepted) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004)).

A genuine voluntary resignation cannot support a constructive discharge claim. "A resignation is voluntary as long as the plaintiff had a choice, even if the alternatives are unpleasant." *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 646 (11th Cir. 2017) (per curiam) (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995) (stating that where plaintiff has a choice, she can "stand pat and fight")). Learning of an employer's intent to fire a plaintiff, accompanied by a reprimand and an offer to transfer offices, are insufficient to support a constructive discharge claim. *See Fitz*, 348 F.3d at 977–78. Furthermore, repeatedly receiving negative performance evaluations "does not rise to the level of such intolerable conditions that no reasonable person would remain on the job." *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

Viewing the evidence in the light most favorable to Plaintiff, the evidence supporting Plaintiff's constructive discharge claim consists of:

- Several negative performance reviews, leading to a verbal warning, Written Warning, and PIP;

- Various meetings with supervisors wherein Plaintiff received negative (and positive) feedback and was coached on how to improve performance;

- San Giovanni was often abrasive, rude, and demanding in his interactions with Plaintiff;

- Defendant failed to fill an open banker position at the Hunter's Creek Branch for a five-month period while Plaintiff worked there, impairing Plaintiff's ability to meet performance objectives;

- Plaintiff's superiors made numerous insensitive comments toward Plaintiff regarding her medical leave negatively affecting performance;

- San Giovanni refused to toll Plaintiff's performance expectations to allow a "ramp-up" period after Plaintiff returned from medical leave;

- Plaintiff's Written Warning imposed "aggressive goals," which Plaintiff thought were unachievable; and

- Plaintiff was presented the option of transferring to the Oviedo Branch, which Plaintiff took but later regretted.

Although Plaintiff paints a picture of an unpleasant work environment, she has not "produce[d] substantial evidence that conditions were *intolerable*." *Akins*, 420 F.3d at 1302 (emphasis added); *Fitz*, 348 F.3d at 977; *cf. Poole*, 129 F.3d at 552 (holding that constructive discharge claim survived summary judgment where the plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); *Meeks v. Comp. Assocs. Int'l*, 15 F.3d 1013, 1014–15, 1021–22 (11th Cir. 1994) (finding that evidence showing the plaintiff was placed on probation, received unjustified performance evaluations, and was berated with such ferocity that the supervisor's "spit was flying in [the plaintiff's] face," supported a constructive discharge claim).

Moreover, Plaintiff's argument that she was given unmeetable performance goals in a bid by San Giovanni to ensure her termination down the road is too speculative to support a constructive discharge claim. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 806 (11th Cir. 2005) ("[T]he possibility that a plaintiff may not remain employed is not by itself enough to place a reasonable person in the position of 'quit or be fired.'"). Plaintiff could have stayed, which indeed may have been an "unpleasant" choice, but she chose to

voluntarily resign. *See Jones*, 707 F. App'x at 646. Accordingly, Plaintiff's constructive discharge claim fails.

The main case cited by Plaintiff in support of her constructive discharge claim, *Green v. City of Birmingham*, No. 2:10-cv-2591-AKK, 2012 WL 13024719 (N.D. Ala. Mar. 5, 2012), is entirely consistent with this conclusion. In *Green*, the plaintiff, Ricky Green, was "repeatedly harassed and intimidated [by his supervisors] into applying for disability retirement." *Green*, 2012 WL 13024719, at *4. As part of their campaign of harassment, Green's supervisors completed pension and disability documents in Green's name without his approval to force his involuntary retirement. *Id.* Green was also tasked with several dangerous projects and given insufficient manpower, causing serious risk of injury. *Id.* The facts of *Green* are inapposite to the facts of this case. To be sure, Plaintiff was faced with a difficult work environment and had poor relationships with her supervisors. However, she simply did not experience the level of harassment and intimidation aimed at forcing her resignation that was subjected to the plaintiff in *Green*.

### B. FMLA Claims

Defendant moves for summary judgment on Plaintiff's FMLA interference and retaliation claims on the ground that (1) Plaintiff has suffered no cognizable injury, and (2) even if Plaintiff proved a cognizable injury, Plaintiff cannot show that PNC's non-retaliatory reasons for adverse actions were a pretext for retaliation. (Doc. 21, pp. 17–18). Defendant is entitled to summary judgment on the FMLA claims based on either ground.

### 1.    *FMLA Interference*

The FMLA makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). The FMLA "grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually for any one or more of several reasons . . . ." *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166 (11th Cir. 2014). To recover on a FMLA interference claim, a plaintiff must demonstrate "that she was denied a benefit to which she was entitled," *Pereda v. Brookdale Senior Living Comms.*, 666 F.3d 1269, 1274 (11th Cir. 2012) (quoting *Harley v. Health Ctr.*, 487 F. Supp. 2d 1344, 1357 (S.D. Fla. 2006)), and that she "has been prejudiced by the violation in some way." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

Plaintiff's FMLA interference claim fails because Plaintiff suffered no cognizable injury. Plaintiff does not dispute that PNC approved all of Plaintiff's requests for medical leave. (*See* Doc. 23; Doc. 21-4, 41:8–12, 43:7–44:14, 93:19–94:2, 161:18–163:9, 168:1–23, 257:10–22). Furthermore, the argument that Plaintiff's FMLA rights were chilled (*Id.* at p. 16) is contradicted by the record, which is bereft of evidence of a single instance in which Plaintiff was dissuaded from taking medical leave because of the Defendant's actions. To the contrary, Plaintiff fully exhausted her FMLA rights irrespective of her supervisors' guilting comments.

However, the damages analysis as to the interference claim does not end there. A plaintiff not entitled to damages may be entitled to equitable relief, "including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B); *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014). The Court is obliged to weigh the facts and

circumstances to determine whether equitable relief is appropriate. *Evans*, 762 F.3d at 1296.

The Complaint demands "judgment against Defendant for back pay, front pay, compensatory and punitive damages, attorney's fees, and for other such relief, in law *or in equity*, to which Plaintiff may be justly entitled." (Doc. 1, pp. 12–13). Further, the FMLA provides for equitable relief including "employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). Because Plaintiff vindicated her FMLA rights to their limit without interference, the Court finds that she is not entitled to equitable relief on the interference claims. Plaintiff simply fails to "demonstrate some harm remediable by either 'damages' or 'equitable relief.'" *See Evans*, 762 F.3d at 1296 (quoting *Ragsdale*, 535 U.S. at 89).

2.     *FMLA Retaliation*

Plaintiff's FMLA retaliation claim also fails because she has not suffered damages. "Even if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999). The FMLA forecloses recovery for "mental distress or the loss of job security." *Id.* Here, Plaintiff exercised her FMLA rights to their limit, was never denied a medical-leave request, and was not constructively discharged. Plaintiff has failed to come forward with evidence showing she suffered damages, thus her FMLA retaliation claim fails. *See Celotex*, 477 U.S. at 322–23.

Assuming Plaintiff met her initial burden of proving a *prima facie* case of FMLA retaliation, Plaintiff has not produced sufficient evidence to show that Defendant's nondiscriminatory rationale for taking adverse actions were pretextual. For FMLA claims, the burden shifting framework applies as set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). "If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action." *Smith v. BellSouth Telecomm., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). If the defendant carries this burden, then "the plaintiff must show the defendant's proffered reason for the adverse action is pretextual." *Id.*[16]

Plaintiff has not produced evidence to permit a reasonable finding that adverse action taken against Plaintiff was pretextual. Each alleged adverse action is supported by a documentary record supporting Defendant's actions. Plaintiff ignores the documented performance problems she experienced—some of which she conceded in her deposition (Doc. 21-4, 88:16–89:25, 142:1–23)—and claims that each negative encounter she faced at PNC was part of a campaign to curtail her FMLA rights and retaliate against her for past leave. These allegations are consistently refuted by the record. Accordingly, Plaintiff's FMLA retaliation claim fails for the alternate reason that Plaintiff did not produce evidence of pretext.

## C.    ADA Claims

Defendant finally moves for summary judgment on Plaintiff's ADA discrimination and retaliation claims. (Doc. 21, pp. 20–22).

The ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application

---

[16] "The burden to avoid summary judgment is not to show by a preponderance of the evidence that the reasons stated were pretext. Rather, plaintiff's burden at summary judgment is met by introducing evidence that could form the basis for a finding of facts, which when taken in the light most favorable to the non-moving party, could allow a jury to find by a preponderance of the evidence that the plaintiff has established pretext." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir.1993).

procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Because Plaintiff has produced no direct evidence of discriminatory animus but, instead, relies on circumstantial evidence to prove her discrimination claims, the Court applies the burden-shifting approach articulated in *McDonnell Douglas*. Thus, Plaintiff bears the initial burden of proving by a preponderance of the evidence that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability. 42 U.S.C. § 12112(a). The parties dispute whether Plaintiff has submitted adequate evidence showing she is disabled.

Plaintiff submits that she has introduced adequate evidence to establish that she is disabled:

> Evidence has been presented that Plaintiff has a disability within the meaning of the ADA, namely psychological conditions including depression and anxiety disorders that substantially limits her ability to work. Evidence has been presented that Plaintiff told each of her supervisors about her condition and specifically that she had numerous conversations with Marc San Giovanni about her condition in requesting he accommodate her with true FMLA leave wherein she would not be responsible for work while on leave.

(Doc. 23, p. 19).[17] Defendant maintains, however, that the record is devoid of evidence that she was substantially limited in any major life activities because of her alleged conditions. (Doc. 21, p. 21).

The ADA defines disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such

---

[17] This section of Plaintiff's brief lacked a single record citation. (*Id.*); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam). It is the responsibility of the litigants, not the Court, to cite the record in support of their arguments for and against summary judgment. *See, e.g.*, *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).

an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The text of the ADA does not define "impairment." However, courts are guided by the EEOC regulations to implement Title I of the ADA. *See* 42 U.S.C. § 12116. The EEOC regulations' definition of "physical or mental impairment," includes "emotional or mental illness." 29 C.F.R. § 1630.2(h).

An impairment is a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(2). "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. Utd. Air Lines, Inc.*, 527 U.S. 471, 491 (2001). The Eleventh Circuit has "stressed that 'substantially limits' means 'prevents or severely restricts' rather than requiring only a 'diminished activity tolerance.'" *Roberts v. Rayonier, Inc.*, 135 F. App'x 351, 356 (11th Cir. 2005). The disability determination must be made on a case-by-case basis with a focus on "the effect of [an] impairment on the life of the individual" and not simply the diagnosis. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).

Plaintiff failed to meet her burden of coming forth with sufficient evidence for a reasonable jury to conclude that she was disabled. Plaintiff relies entirely on her own deposition testimony which is inconclusive on the matter. The record is bereft of evidence that Plaintiff's mental condition "prevents or severely restricts" Plaintiff in her ability to

work—or that she is "unable to work in a broad class of jobs." *See Sutton*, 527 U.S. at 491; *Roberts*, 135 F. App'x at 356. Though Plaintiff took significant medical leave, she returned from each leave of absence full-time with no restrictions, and never sought an accommodation based on a mental condition she was experiencing.[18] Indeed, the only medical record before the Court is a note from Plaintiff's doctor stating that Plaintiff may return to work "full time [with] no restrictions." (Doc. 21-5, p. 17). In the absence of a disability, Plaintiff's ADA claims fail. *See Celotex*, 477 U.S. at 322–23.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant PNC Bank, N.A.'s Motion for Summary Judgment (Doc. 21) is **GRANTED**.

2. The Clerk of Court is **DIRECTED** to:

   a. Enter judgment in favor of Defendant PNC Bank, N.A.;

   b. Terminate any other pending motions and deadlines; and

   c. Close the file.

**DONE AND ORDERED** in Orlando, Florida on October 10, 2018.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

---

[18] Plaintiff did, however, seek accommodations relating to her performance expectations to allow her to "ramp up" the performance at her branch in light of her leaves of absence. (Doc. 21-5, 40:2–45:23). These accommodation requests were unrelated to any alleged ongoing reduction in Plaintiff's capacity to complete her work functions stemming from a mental condition.

Counsel of Record
Unrepresented Parties